IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

CHRISTOPHER HENRY DERAGON,

             Petitioner,                No. CIV S-02-0526 MCE JFM P

    vs.

EDWARD S. ALAMEIDA, JR., et al.,

             Respondents.            FINDINGS & RECOMMENDATIONS

_____/

          Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1997 conviction on charges of robbery and first degree murder with use of a firearm.  He seeks relief on the grounds that: (1) his confession was involuntary and coerced, in violation of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution; and (2) his rights to due process and to present a defense were violated by the use of erroneous jury instructions.  Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL BACKGROUND

          On May 13, 1997, a complaint was filed in the Sacramento Superior and Municipal Court charging petitioner and co-defendant Angelo Garcia with murder by use of a

1   firearm, in violation of Cal. Penal Code §§ 187(a) and 12022.5(a), with a special circumstance

2   allegation that the murder was committed while petitioner was engaged in the commission or

3   attempted commission of the crime of robbery, within the meaning of Cal. Penal Code §

4   190.2(a)(17) (count one); and (2) robbery by use of a firearm, in violation of Cal. Penal Code §§

5   211 and 12022.5(a) (count two).  (Clerk's Transcript on Appeal (CT) at 9-11.)

6          On July 24, 1997, prior to the start of trial, the trial court denied petitioner's

7   motion to suppress statements he made to police investigators.  (Reporter's Transcript on Appeal

8   (RT) at 18.)  After a jury trial, with separate juries for petitioner and co-defendant Garcia,

9   petitioner was convicted of one count of first degree murder with personal use of a firearm and

10  one count of robbery with personal use of a firearm.  (CT at 244-45.)  The special circumstance

11  was found to be not true.  (Id.)  On October 10, 1997, the trial court sentenced petitioner to an

12  aggregate prison term of 26 years-to-life in state prison.  (Id. at 274.)

13         Petitioner filed a timely notice of appeal.  (Id. at 277.)  Petitioner's conviction was

14  affirmed by the California Court of Appeal for the Third Appellate District in an unpublished

15  decision dated December 19, 2000.  (Answer, Ex. D.)  On January 2, 2001, petitioner filed a

16  petition for rehearing in the California Supreme Court.  (Answer, Ex. E.)  That petition was

17  denied in a reasoned decision dated January 12, 2001.  (Answer, Ex. F.)  On January 24, 2001,

18  petitioner filed a petition for review in the California Supreme Court.  (Answer, Ex. G.)  That

19  petition was summarily denied by order dated March 28, 2001.  (Answer, Ex. H.)

20                          FACTUAL BACKGROUND[1]

21         [Petitioner] participated with his friend, Angelo Garcia, in a plan to
           rob 17-year-old Eric Hesterlee, a marijuana dealer. [Petitioner]
22         arranged for the victim to meet him at a schoolyard on the pretext
           that [petitioner] wanted to purchase a pound of marijuana.  The
23         plan was for Garcia to enter the schoolyard by a different route in
           order to take the victim, and supposedly [petitioner], by surprise.

24

25         [1]  The following summary is drawn from the December 19, 2000, opinion by the
      California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 2-3,
26    filed on March 3, 2003, as Exhibit D to Respondents' answer.

                                    2

Garcia would pretend to rob both [petitioner] and the victim and, in that manner, obtain the victim's marijuana and perhaps other things of value. To make the charade more convincing, [petitioner] made a phony "wad" by wrapping some money around a roll of cut up newspaper. He planned to give the phony money roll to Garcia to convince the victim that [petitioner] also was being robbed.

At the appointed time, [petitioner] met the victim and walked with him into the schoolyard. Garcia entered the schoolyard from a different direction, while leaving his friend, Randy Bettencourt, in Garcia's car with the engine running. Garcia put on a mask, holding a pistol, accosted [petitioner] and the victim. [Petitioner] put on what he later described as a "four-star," Oscar-winning performance, pretending to resist but ultimately giving Garcia the phony roll of money. Garcia demanded and obtained the victim's marijuana. When Garcia demanded the victim's car keys, the victim attempted to resist. Garcia fired three shots, two of which struck and killed the victim.

During the encounter, some of the victim's marijuana spilled onto the ground. Garcia took the remaining marijuana and fled to his car. Soon after the shooting, officers stopped the car a short distance from the scene of the crime. On his person, Garcia had the marijuana and phony roll of money. The murder weapon was on the floorboard of his car.

[Petitioner] fled the crime scene separately. In an interview the following morning, he disclosed his role in the crime. He was arrested several days later.

(People v. Deragon, slip op. at 2-3.)

ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

/////

1       Under section 2254(d)(1), a state court decision is "contrary to" clearly

2  established United States Supreme Court precedents "if it 'applies a rule that contradicts the

3  governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are

4  materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at

5  different result.  Early v. Packer, 573 U.S. 3, 8 (2002) (quoting Williams v. Taylor, 529 U.S. 362,

6  405-406 (2000)).

7       Under the "unreasonable application" clause of section 2254(d)(1), a federal

8  habeas court may grant the writ if the state court identifies the correct governing legal principle

9  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10 prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

11 simply because that court concludes in its independent judgment that the relevant state-court

12 decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13 application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

14 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15 question, is left with a 'firm conviction' that the state court was 'erroneous.'")

16      The court looks to the last reasoned state court decision as the basis for the state

17 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

18 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

19 habeas court independently reviews the record to determine whether habeas corpus relief is

20 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

21 II.  Petitioner's Claims

22      A.  Petitioner's Confession

23      Petitioner's first claim is that his federal constitutional rights were violated when

24 the trial court denied his motion to suppress his statement to police interrogators.  This claim is

25 based on several grounds.  First, petitioner contends that his statements were obtained during

26 custodial interrogation in violation of his rights pursuant to Miranda v. Arizona, 384 U.S. 436

4

1   (1966).  Second, petitioner argues that his statements given after <u>Miranda</u> warnings constituted

2   an invocation of his rights to counsel and to remain silent that were not honored by the police.

3   Last, petitioner contends that he did not knowingly and voluntarily waive his rights to counsel

4   and to remain silent.

5         The California Court of Appeal fairly described the facts surrounding this claim as

6   follows:[2]

7       On the morning after the crime, detectives went to [petitioner's]
    house and spoke with him and his parents.  When [petitioner]

8       revealed his participation in the scheme, the detectives decided to
    take him to the station where they conducted a videotaped

9       interview. [Petitioner] was not under arrest at the time; he was
    permitted to return home after the interview, and was not arrested

10      until several days later.  At trial, the videotape of the interview was
    shown to [petitioner's] jury.

11

12      During the early portion of the interview, the following exchange
    occurred between Detective Fancher and [petitioner]:

13      "FANCHER: Okay, Um – before I get into this, we got – we're
    gonna go over a formality, and you've probably watched it on TV

14      to where – um – you've heard of your rights? [¶] [PETITIONER]:
    Yeah. [¶] FANCHER: Everyone says, ah you – you know, should

15      have advised – advised me of my rights.  Well, that's what this is.
    All right.  It's called a <u>Miranda</u> warning.  Before we get into all

16      this detailed stuff, I'm just gonna go over this with you."

17      Fancher then read the <u>Miranda</u> rights, and [petitioner] said he
    understood them. [Petitioner] checked and initialed each of the

18      rights on a written waiver form.

19      When Fancher asked whether he wished to talk, [petitioner] said:
    "I mean, I do, but I don't want to – I don't want none of this to

20      come back to me in court.  I don't want to go to jail over none of
    this."  Fancher reminded him that, at his parents' house,

21      [petitioner] had given detectives a "crash course" concerning what
    had happened.  Fancher indicated he was going to document

22      [petitioner's] statement, along with the statements of others, and
    would compile a report to submit to the district attorney.  He told

23      [petitioner] that it would be up to the district attorney's office to
    decide what to do with the information.  Fancher emphasized: "I

24

25      [2] In reviewing petitioner's claims, this court reviews the "last reasoned decision" by the
    state court, which in this case is the California Court of Appeal's denial of petitioner's direct

26  appeal.  <u>Robinson v. Ygnacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004.)

don't know what's gonna happen, and neither does Ron [Detective Garverick]."

At this point, Detective Garverick said: "You're not gettin' arrested today," and reminded [petitioner] he already had been told that. [Petitioner] replied: "Yeah. I know this. I know that I'm not goin' to jail today. It's just when this – when all this comes out, it's like am I gonna get brought into this and get sent to jail for – [¶] . . . [¶] – conspiracy or just like . . [?]" Fancher repeatedly told [petitioner] that the detectives did not know.

[Petitioner] then said: "Do I want to have a lawyer present?  I mean, that's what I – it's like that's what I want to know.  Do I need – ."  After acknowledging that he had talked to the detectives at his house, [petitioner] said "all right" and signed the form waiving his <u>Miranda</u> rights.

The detectives then reiterated that they did not know what would happen to [petitioner] if he agreed to answer their questions. [Petitioner] responded: "I don't want to know what's gonna happen, but – I – I just kind of want to be kind of reassured that it's not – this ain't gonna come back on me, I'm gonna go to jail forever, you know, along with this – along with Angelo for doin' this (unintelligible)."  When Fancher stated he did not know, [petitioner] said: "All right."  Fancher commented: "What can I say?  You know.  We're – we're gonna – what we're gonna do is try to find the truth of what happened, and – ah – talk to as many people as we can to find that out and then submit it to the D.A., and where it falls from there it's gonna be up to them.  Okay?" [Petitioner] then proceeded to answer the detectives' questions.

(Opinion at 3-5.)

In <u>Miranda v. Arizona</u>, the United States Supreme Court held that the Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during "custodial interrogation" without a prior warning.  384 U.S. at 444.  Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> Whether a suspect is "in custody" for purposes of <u>Miranda</u> is an objective test.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 662-63 (2004).  Two inquiries are necessary for a determination of an individual's "in custody" status: (1) the overall circumstances surrounding the interrogation; and (2) given those circumstances, whether a reasonable person in the suspect's situation would have

1  felt free to terminate the interrogation and leave.  Id.  See also Stansbury v. California, 511 U.S.

2  318, 322 (1994) ("the ultimate inquiry is simply whether there [was] a formal arrest or restraint

3  on freedom of movement of the degree associated with a formal arrest") (quoting California v.

4  Beheler, 463 U.S. 1121, 1125 (1983); Berkemer v. McCarty, 468 U.S. 420, 442 (1984) (custody

5  must be determined based on a how a reasonable person in the suspect's situation would perceive

6  his circumstances and "[a] policeman's unarticulated plan has no bearing on the question whether

7  a suspect was 'in custody' at a particular time").  The protections provided by Miranda attach only

8  when an individual is both in custody and being interrogated.  See McNeil v. Wisconsin, 501

9  U.S. 171, 182 n.3 (1991) ("We have in fact never held that a person can invoke his Miranda

10  rights anticipatorily, in a context other than 'custodial interrogation'"); Edwards v. Arizona, 451

11  U.S. 477, 484-85 (1981) (holding that an accused has the right to have counsel present during

12  custodial interrogation).

13          The state appellate court concluded that petitioner was not in custody when he

14  answered the detectives' questions at the police station and, therefore, "Miranda and it's progeny

15  do not apply to him."  (Opinion at 9.)  The court reasoned as follows:

16          All three participants in the videotaped interview expressly stated
            their understanding that [petitioner] would not be arrested that day
17          – the detectives previously had told [petitioner] he would not be
            arrested that day; they reiterated this assurance while they
18          interviewed him; and [petitioner] acknowledged he knew he would
            not be arrested that day.  This was no subterfuge for the record.  At
19          the conclusion of the interview, the detectives took [petitioner]
            home as they had promised.  He was not arrested for several days
20          thereafter.

21          The question of custody was not litigated further because, in
            moving to suppress the statements, defense counsel essentially
22          conceded that [petitioner] was not in custody during the interview
            – in defense counsel's words, "it appears clear that and from the
23          statements in the police report as to [petitioner's] first statement
            taken in his home and the later statement at the police station
24          approximately an hour or so later, that he was not under arrest and,
            in fact, was returned home by the Sheriff's office, Sheriff's
25          Department."  Consequently, the suppression motion was
            determined solely on the basis of the transcript of the interview.

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Having watched the videotaped interview in which [petitioner]
admitted to the detectives that he was involved in the incident
which resulted in the victim's death, we conclude that a reasonable
person in [petitioner's] position would have believed, as
[petitioner] did, that he was not in custody.  [Petitioner] was not
placed in handcuffs or any other bodily restraint, and he was left
alone on several occasions.  The detectives acted in a very low-key,
nonconfrontational manner.  And they advised [petitioner] that he
was not in custody, that he had the right to refuse to answer their
questions, that he would be taken home after the interview, and
that it was up to the district attorney's office to decide what would
happen to [petitioner] if he answered the detectives' questions.

[Petitioner] argues that the fact the detectives advised him of his
Miranda rights is an indication he was in custody.  But, as
[petitioner] appropriately notes, an officer's uncommunicated
knowledge or belief in the need for a Miranda advisement is not a
relevant factor in resolving the question of custody.  (People v.
Stansbury, supra, 9 Cal.4th at page 830, fn. 1.)  Nonetheless,
[petitioner] asserts that a reading of the Miranda rights would
affect how a reasonable person would understand his position.

While we agree that, in some situations, a formal advisement of
Miranda rights might indicate to a reasonable person that he has
been arrested, we decline to adopt a blanket rule that an advisement
of rights establishes custody.  Such a rule would be contrary to the
established principle that the totality of the circumstances must be
considered and no one factor is dispositive.  (See People v. Boyer
(1989) 48 Cal.3d 247, 272; disapproved on another point in People
v. Stansbury, supra, 9 Cal.4th at page 830, fn. 1.)  Moreover, it
would be bad policy in that it would serve to dissuade officers from
giving an advisement unless and until they intend to make an
immediate arrest.  This would be contrary to the United States
Supreme Court's observation that police officers are free to follow
procedures that are more protective of a suspect's rights than the
minimum dictates of the Constitution.  (McNeil v. Wisconsin,
supra, 501 U.S. at pp. 181-182 [115 L.Ed. 2d at pp. 171-171].)

Here, in view of the express acknowledgment by all three
participants in the interview that [petitioner] was not going to be
arrested that day, and in light of the other circumstances we have
noted above, the reading of Miranda rights does not establish that
[petitioner] was in custody or that a reasonable person in his
position would have believed he was in custody.  Rather, viewed
objectively, the totality of the circumstances leads to the
conclusion that [petitioner] was not in custody when he spoke with
the detectives.

(Id. at 7-9.)

/////

Petitioner argues that he was in custody during the police interrogation because: (1) he was only 18 years old at the time of the questioning; (2) he was taken from his parents' home to the police station at 6:00 a.m. and was put in a windowless interrogation room; (3) at the police station, petitioner's "freedom of movement was restricted for at least 10 minutes;" and (4) he received <u>Miranda</u> warnings.  (Separate Memorandum in Support of Petition for Writ of Habeas Corpus (Memo) at 17-19.)  Petitioner argues, "a reasonable 18 year-old high school student in petitioner's position would have felt completely at the mercy of the police, and would not have believed he was at liberty to terminate the interrogation and, without the detectives permission, walk out of the closed-door interrogation room and leave the Sheriff's station (without a car)." (<u>Id.</u> at 19.)  Petitioner notes that, while detectives informed him that they would take him home after the interview, they told him this after the interview took place and they made him wait for thirty minutes for a ride.

Although the factors mentioned by petitioner, including the fact that he received <u>Miranda</u> warnings, arguably weigh in favor of a determination that petitioner was in custody, the court of appeal's decision to the contrary was not objectively unreasonable in light of the other factors, described by that court, militating against a finding of custody.[3]  <u>See Yarborough</u>, 541 U.S. at 2149-50 (holding that the state court's application of the custody test was reasonable despite "differing indications"); <u>Beheler</u>, 463 U.S. at 1124-25 (suspect not "in custody" where he called the police and told them at the crime scene that his friend had killed the victim, then voluntarily agreed to accompany police to the station house after being told he was not under arrest, and was allowed to return home after the interview); <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977) (it was "clear" the petitioner was not "in custody" where he came voluntarily to the police station, was immediately informed that he was not under arrest, and at the close of the

---

[3]  Although the videotape of petitioner's police interrogation has not been lodged with this court, the appellate court's factual findings are presumed correct and have not been rebutted by clear and convincing evidence.  28 U.S.C. § 2254 (e)(1).

1  police interview he left the police station without hindrance).  Petitioner's complaints that the

2  interview took place in a "windowless" interrogation room behind closed doors are not

3  dispositive of the custody question.  See Beheler, 463 U.S. at 1125 ("we have explicitly

4  recognized that Miranda warnings are not required "simply because the questioning takes place

5  in the station house, or because the questioned person is one whom the police suspect").  Nor is

6  the fact that petitioner was given his Miranda warnings.  United States v. Bautista, 145 F.3d

7  1140, 1147 (9th Cir. 1998) (the reading of the Miranda warning to a suspect does not create a

8  custodial interrogation).  Further, although petitioner had to wait for thirty minutes before being

9  driven home after the interview, a reasonable wait was to be expected, and petitioner knew all

10  along that he would not be going to jail that day and was not under arrest.  Considering all of the

11  circumstances as a whole, the conclusion of the California courts that petitioner was not "in

12  custody" is not an unreasonable application of federal law.  Accordingly, it should not be set

13  aside.[4]

14  _____

15      [4] In Missouri v. Seibert, 542 U.S. 600 (2004), the United States Supreme Court
addressed the admissibility of a confession obtained after a Miranda warning but preceded by the
suspect's earlier, unwarned incriminating statements.  The court held that a trial court must

16  suppress a confession obtained after a Miranda warning if it was obtained during a deliberate
"twostep" interrogation where the police deliberately withheld the Miranda warning until the

17  suspect confessed, followed by a Miranda warning and a repetition of the confession previously
given.  Id. at 604.  The holding in Seibert has been summarized by the United States Court of

18  Appeals for the Ninth Circuit as follows:

19          In sum, when a law enforcement officer interrogates a suspect but
does not give a Miranda warning until after obtaining a confession

20  or an incriminating statement, a court in deciding whether to
suppress a subsequent postwarning confession must determine

21  whether the warning was deliberately withheld.  The court should
consider any objective evidence or available expressions of

22  subjective intent suggesting that the officer acted deliberately to
undermine and obscure the warning's meaning and effect.

23

24  United States v. Williams, ___ F.3d ___, 2006 WL 213852 (C.A. 9 (Cal.)) at *9.  Seibert
followed the decision in Oregon v. Elstad, in which the Supreme Court held that "a suspect who

25  has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving
his rights and confessing after he has been given the requisite Miranda warnings."  470 U.S. 298,

26  318 (1985).

1    As noted by the California Court of Appeal, a finding that petitioner was not "in

2    custody" during the police interrogation, "alone is sufficient to reject his claim that the interview

3    should have been suppressed."  (Opinion at 9.)  This is because <u>Miranda</u> dealt with an

4    individual's Fifth and Fourteenth Amendment right to be free from compelled self-incrimination

5    in the context of custodial interrogations.  "Absent either a custodial situation or official

6    interrogation, <u>Miranda</u> and <u>Edwards</u> are not implicated."  <u>Bautista</u>, 145 F.3d at 1147.

7    Accordingly, if petitioner was not in custody during the questioning, then his attempts to invoke

8    his right to remain silent and his <u>Miranda</u> right to counsel were ineffective.

9    Notwithstanding the issue of petitioner's custody status, the California Court of

10   Appeal rejected petitioner's claims that he invoked his rights to remain silent and to counsel, and

11   that his confession was involuntary.  The court reasoned as follows:

12   In any event, [petitioner's] equivocal statements at the beginning of
     the interview, indicating he was unsure whether he wanted to talk
13   to the detectives or whether he needed an attorney, were not
     sufficient to constitute an invocation of his right to counsel and his
14   right to remain silent.  (<u>People v. Crittenden</u> (1994) 9 Cal.4th 83,
     129-130.)  We also reject his argument that the record compels the
15   conclusion that he did not knowingly and voluntarily waive his
     rights.  An express oral or written waiver, while not inevitably

16

17   In this case, petitioner made incriminating statements to the police when he was
     first questioned at his parents' home.  He was then transported to the police station and
18   immediately given his <u>Miranda</u> warnings, whereupon he repeated his confession.  Although this
     procedure appears to mirror the "two-step" procedure discussed in <u>Seibert</u>, there is no evidence
19   in the record, and petitioner does not argue, that the police deliberately withheld the <u>Miranda</u>
     warnings at his parents' home in order to undermine <u>Miranda</u>, or that they employed the two-step
20   tactic "to render <u>Miranda</u> warnings ineffective by waiting for a particularly opportune time to
     give them, after the suspect has already confessed."  <u>Seibert</u>, 542 U.S. at 611.  There is also no
21   substantial evidence that the midstream <u>Miranda</u> warning in this case failed to effectively apprise
     petitioner of his rights, <u>Seibert</u>, 542 U.S. at 616; <u>Williams</u>, 2006 WL 213852 at *1 (holding, in
22   the context of a direct appeal from a federal criminal conviction, that a trial court must suppress
     post-warning confessions obtained during a deliberate two-step interrogation where the
23   midstream <u>Miranda</u> warning, in light of the objective facts and circumstances, did not effectively
     apprise the suspect of his rights), or that the police questioning at the home of petitioner's parents
24   was coercive or resulted in involuntary statements.  <u>Elstad</u>, 470 U.S. at 318.  In addition, as
     described above, and unlike the defendants in <u>Seibert</u> and <u>Williams</u>, petitioner was not "in
25   custody" when he was questioned by police, either at his home or at the police station.  For these
     reasons, the decision of the California Court of Appeal rejecting petitioner's claim is not contrary
26   to or an unreasonable application of <u>Seibert</u>.

1                sufficient, is strong proof of the validity of a waiver.  (People v.

2                Whitson (1998) 17 Cal.4th 229, 246.)  Here, [petitioner] signed a
written waiver and said he wanted to talk about the incident.  The

3                record is devoid of any indication that the detectives used physical
or psychological pressure to elicit statements from [petitioner].

4                While the record reflects that [petitioner] was concerned about the
consequences of his participation in the criminal enterprise and

5                sought reassurance from the detectives, they steadfastly refused to
give him express or implied promises of leniency.

6                Considering the totality of the circumstances, the trial court
properly refused to suppress the evidence of [petitioner's]

7                videotaped statements to the detectives.

8  (Opinion at 9-10.)

9          Petitioner argues that his statement, "Do I want to have a lawyer present?  I mean,

10  that's what I – it's like that's what I want to know" was an unequivocal request for counsel.  He

11  contends that because that request went unheeded, his confession should have been suppressed.

12  This court disagrees.  Petitioner's statements were ambiguous and did not constitute an

13  unequivocal request for counsel.  See Davis v. United States, 512 U.S. 452, 462 (1994) (finding

14  that the statement, "[m]aybe I should talk to a lawyer," was ambiguous, and hence was not a

15  request for counsel); Clark v. Murphy, 331 F.3d 1062, 1066 (9th Cir. 2003) (defendant's

16  statement "I think I would like to talk to a lawyer" was ambiguous, and therefore the police were

17  not required to cease questioning); United States v. Ogbuehi, 18 F.3d 807, 813 (9th Cir. 1994)

18  (defendant's question, "Do I need a lawyer" or "Do you think I need a lawyer" does not "rise to

19  the level of even an equivocal request for an attorney"); Diaz v. Senkowski, 76 F.3d 61, 63 (2d

20  Cir.1996) (suspect's statement "[d]o you think I need a lawyer" was ambiguous within the

21  meaning of Davis).  The conclusion of the state appellate court to the same effect is not

22  objectively unreasonable.

23          This court also agrees with the state court's finding that petitioner did not

24  effectively invoke his right to remain silent.  Petitioner directs the court's attention to his

25  statements that he didn't want his statements "to come back to [him] in court" and that he didn't

26  "want to go to jail over none of this."  (Memo at 19-20.)  This is insufficient to constitute a

1    request to terminate the interview.  At no point did petitioner choose to remain silent by

2    exercising his right to cut off questioning.

3            Petitioner further contends that his confession was not voluntarily obtained.

4    Supreme Court precedent requires a court to determine the voluntariness of a statement based on

5    "the totality of all the surrounding circumstances."  Schneckloth v. Bustamonte, 412 U.S. 218,

6    226 (1973).  "'No single criterion controls whether an accused's confession is voluntary.'"  Nelson

7    v. Walker, 121 F.3d 828, 833 (2d Cir. 1997) (quoting Green v. Scully, 850 F.2d 894, 901 (2d

8    Cir.1988)).  A confession is voluntary if it "is the product of an essentially free and unconstrained

9    choice and involuntary if the product of a will overborne."  Mancusi v. Clayton, 454 F.2d 454,

10   456 (2d Cir.1972) (citing Lynumn v. Illinois, 372 U.S. 528, 534 (1963)).  A waiver of

11   constitutional rights must be "made in full awareness of the nature of the right being waived and

12   the consequences of waiving."  Bautista, 145 F.3d at 1149.  Factors to be considered include: the

13   characteristics of the accused, such as his experience, background, and education; the conditions

14   of the interrogation; and the conduct of the law enforcement officials, including whether there

15   was physical abuse, a long period of restraint in handcuffs, use of psychologically coercive

16   tactics, or trickery.  See id.; Green, 850 F.2d at 901.  Although not dispositive, "[a]n express

17   written or oral statement of waiver of the right to remain silent or of the right to counsel is

18   usually strong proof of the validity of that waiver."  North Carolina v. Butler, 441 U.S. 369, 373

19   (1979).

20           The California Court of Appeal found petitioner's claim that his confession was

21   involuntary to be without merit, and this Court agrees.  Petitioner claims that the detectives

22   "closed me off in an interrogation room and questioned me," ignored his requests for legal

23   counsel, and "made me think I gave up my right to an attorney by talking to them at my parent's

24   home."  (Pet. at 5 & Attach. A.)  He also states that he "did not understand that my statements to

25   the detectives could be used against me and used to prosecute me," nor did he understand "the

26   consequences of not having an attorney assist me."  (Pet., attach. A.)  The record belies

13

1   petitioner's assertion that he did not understand his statements could be used against him; he was

2   specifically so advised and stated that he understood that advice.  There was no indication of

3   physical abuse, nor was petitioner handcuffed.  There is no indication that the police intimidated,

4   coerced or deceived petitioner at any stage of the interrogation.  The officers advised petitioner

5   repeatedly that they could make him no promises.  Further, petitioner was read his rights shortly

6   after he was brought into the room.  He acknowledged those rights and waived them orally and in

7   writing.  Petitioner notes that immediately after he stated, "do I want to have a lawyer present?"

8   one of the detectives reminded him that he had "talked to us already at your house."  (Memo at

9   23.)  Petitioner argues that this statement by the officer coerced him into waiving his rights "by

10  improperly implying that petitioner had already waived these rights by talking to the detectives at

11  his home."  (Id. at 23-24.)  This court disagrees that these statements constituted improper

12  coercion.  In addition, petitioner was specifically given an opportunity at that time to waive his

13  rights and chose to do so.  Based on the totality of the circumstances, this court concludes that

14  petitioner voluntarily and knowingly waived his constitutional rights at the police interview.  The

15  decision of the state courts to the same effect is not contrary to United States Supreme Court

16  authority and should not be set aside.

17          Even assuming arguendo that the trial court erred in admitting petitioner's

18  statements to police, any error was harmless.  "Erroneous admission of a confession does not

19  constitute structural error."  Williams, 2006 WL 213852 at *11 (citing Arizona v. Fulminante,

20  449 U.S. 279, 306-12 (1991).  Accordingly, where an involuntary confession is improperly

21  admitted at trial, a reviewing court must apply a harmless error analysis, assessing the error "in

22  the context of other evidence presented in order to determine whether its admission was harmless

23  beyond a reasonable doubt."  Fulminante, 499 U.S. at 308.  In the context of habeas review, the

24  standard is whether the error had substantial and injurious effect or influence in determining the

25  jury's verdict.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); Henry v. Kernan, 197 F.3d

26  1021, 1029 (1999).  The analysis must be conducted with an awareness that "a confession is like

14

1    no other evidence," and that "a full confession may have a 'profound impact' on the jury."

2    Fulminante, 499 U.S. at 296.  See also Henry, 197 F.3d at 1029-30.

3           One of the witnesses at petitioner's trial was Jessica Kiser, a friend of both

4    petitioner and the victim, Hesterlee.  Kiser testified that she called petitioner three days after the

5    shooting and asked him what had happened.  (RT at 231, 232.)  Petitioner described essentially

6    the same scenario that he told the police, except that he told Kiser he didn't know Garcia was

7    going to bring a gun.  (Id. at 232-41.)  Tyrone Lane, a friend of both petitioner and Hesterlee, also

8    testified at petitioner's trial.  He testified that petitioner told him he "took [Hesterlee] there to get

9    jacked, but I didn't mean for him to get killed, but he tried to be a hero, what was I supposed to

10   do?  (Id. at 246.)[5]  Randy Bettencourt also testified at petitioner's trial, in a way that was largely

11   favorable to petitioner.  However, Bettencourt's previous statements to police, in which he

12   implicated petitioner as the mastermind of an intended robbery of the victim, were played for the

13   jury.  In light of all of this testimony, petitioner's statements regarding his involvement in the

14   crimes were largely superfluous and could not have had a "substantial" effect on the verdict.

15          For all of these reasons, petitioner is not entitled to relief on his claim that his

16   federal constitutional rights were violated by the trial court's refusal to suppress his statements to

17   police.

18          B.  Jury Instructions

19          Petitioner claims that several jury instructions given at his trial misstated the law

20   and precluded the jury from considering witness Randy Bettencourt's accomplice status and

21   grant of immunity in evaluating his testimony.  (Pet. at 5.)  He argues that the errors violated his

22   right to present a complete defense and to a fair trial because they precluded the jury from

23   /////

24

25          [5]  Through the transcript of Bettencourt's statements to police, the jury was informed that
     a "jacking" could mean anything from a robbery to a theft, but that it usually meant a robbery
26   "with a gun."  (Clerk's Supplemental Transcript on Appeal at 82-84.)

considering evidence which would have cast doubt on Bettencourt's extrajudicial inculpatory

statements.

Witness Randy Bettencourt gave conflicting stories to the police about his role in

the killing of Hesterlee.  As explained by the California Court of Appeal:

> Bettencourt drove Garcia's car to and from the scene of the crime.
> When questioned on the night of the crime, he claimed he thought
> Garcia was going to the park to sell some marijuana.  Later, under
> a promise of immunity, he said that Garcia was going to "jack" the
> victim, that [petitioner] had set it up, and that [petitioner] was
> going to pretend he also was being robbed.  At trial, Bettencourt
> retracted his earlier statement and claimed Garcia said he was
> going to the schoolyard to sell marijuana.  However, the prosecutor
> introduced evidence that Bettencourt's testimonial recantation was
> motivated by fear of Garcia and his associates.

(Opinion at 19.)  A review of the record reflects that Bettencourt testified he had been granted

immunity and that he could not be prosecuted for anything he "may have done wrong" on the

night of the crime.  (RT at 39-40.)  Bettencourt testified that his earlier statements to the effect

that petitioner and Garcia were intending to rob Hesterlee were false; however, he did not have

any explanation for why he would have made these false statements to the police.  (Id. at 44-45,

85.)  Bettencourt acknowledged that after he gave those earlier statements he was "shot at by

somebody in San Francisco."  (Id. at 47.)  He also testified he was concerned about the safety of

his family and that he had a fear of retaliation.  (Id. at 85-86.)  Bettencourt testified that he had

earlier told the police "what they wanted to know" but that he was now telling the truth.  (Id. at

91.)  Mr. Bettencourt's earlier statements to the police, wherein he inculpated petitioner in the

robbery, was played for the jury.  (Id. at 66, 69, 72.)  Also played for the jury were Bettencourt's

statements to police given on the night of the crime, which corresponded to his trial testimony.

(Id. at 75-76.)

Pursuant to California law:

> A criminal conviction cannot be based solely upon the testimony or
> extrajudicial statements of an accomplice.  (Pen. Code, § 1111;
> People v. Rodrigues (1994) 8 Cal.4th 1060, 1133.)  To support a

1

2

3

4

5

6

7

> conviction, accomplice testimony must be corroborated by other evidence tending to connect the accused to the commission of the offense. (Pen. Code, § 1111.) Corroborating evidence may be slight and entitled to little consideration when standing alone but, to be sufficient, it must tend to implicate the defendant in the commission of the crime independently of the testimony of the accomplice. (People v. Rodrigues, supra, 8 Cal.4th at p. 1128.) When the prosecution presents the testimony of an accomplice, the jury should be instructed to view such testimony with care and caution. (People v. Guiuan (1998) 18 Cal.4th 558, 569.) For these rules to apply, the defendant has the burden of establishing the witness's accomplice status by a preponderance of the evidence. (People v. Sully (1991) 53 Cal.3d 1195, 1228.)

8   (Opinion at 19-20.) Although the trial court did not instruct the jury that Bettencourt was an

9   accomplice as a matter of law, it did give accomplice instructions. Those instructions, and

10  petitioner's objections thereto, are the following.

11          The trial court orally instructed petitioner's jury pursuant to CALJIC No. 3.10 on

12  the definition of an accomplice, stating as follows: "an accomplice is a person 'charged' who is

13  subject to prosecution for the identical offense charged in Counts One and Two against the

14  Defendant on trial by reason of aiding or abetting." (RT at 372-73.) However, the written

15  version of this instruction provided to the jury stated, "an accomplice is a person who "is subject

16  to prosecution" for the identical offense charged in Counts 1 and 2 against the defendant on trial

17  by reason of aiding and abetting." (CT at 123.) Petitioner argues that both versions of CALJIC

18  No. 3.10 given to his jury were incorrect. He notes that Bettencourt was not "charged" with

19  anything and he was not "subject to prosecution" because he had been granted immunity.

20  Petitioner contends that the incorrect wording of this instruction left his jury "with the erroneous

21  impression that Bettencourt was not an accomplice." (Memo at 29, 30.)

22          Petitioner's jury was also instructed with CALJIC No. 2.27, which provides that:

23          you should give the testimony of a single witness whatever weight
            you think it deserves. Testimony by one witness which you believe
24          concerning any fact is sufficient for the proof of that fact. You
            should carefully review all of the evidence upon which the proof of
25          that fact depends.

26  /////

17

1 (RT at 369; CT at 110.)  Petitioner argues that the language of this jury instruction conflicts with

2 the state law requirement that accomplice testimony be corroborated.  He contends that the

3 instruction should have been given in a modified form "to contain an explicit reference to

4 testimony requiring corroboration."  (Memo at 30.)

5         Petitioner's jury was also given the written version of CALJIC No. 2.11.5, which

6 provides:

> There has been evidence in this case indicating that a person other
> than the defendant was or may have been involved in the crime for
> which the defendant is on trial.  There may be many reasons why
> that person is not here on trial.  Therefore, do not discuss or give
> any consideration as to why the other person is not being
> prosecuted in this trial or whether he has been or will be
> prosecuted.  Your sole duty is to decide whether the People have
> proved the guilt of the defendant on trial.

12 (CT at 103.)  Petitioner argues that this jury instruction should not have been given because when

13 a participant who is not prosecuted testifies at trial, the jury is entitled to consider lack of

14 prosecution in assessing credibility.

15         The essence of petitioner's claim in the instant petition is that the cumulative

16 effect of the jury instruction errors described above violated his rights to present a defense and to

17 a fair trial because they failed to inform the jurors that they should view Bettencourt's

18 exculpatory statements to police with caution.  The California Court of Appeal rejected

19 petitioner's arguments because petitioner could have suffered "no conceivable prejudice" from

20 the instructions as given.  (Opinion at 23.)  The appellate court reasoned as follows:

> With respect to the requirement of corroboration of accomplice
> testimony, [petitioner] argues the requirement is such a
> fundamental principle of justice that error requires reversal unless
> it is harmless beyond a reasonable doubt.  But this argument has
> been rejected by the Supreme Court.  (People v. Frye (1998) 18
> Cal.4th 894, 966.)  A failure to instruct on corroboration of
> accomplice testimony will not require reversal if a review of the
> entire record reveals sufficient evidence of corroboration.  (Ibid.)
> Corroboration may be slight and need only connect the defendant
> to the commission of the crime.  (Ibid; Pen. Code § 1111.)  Here,
> [petitioner's] statements to detectives (both at his home and in his

videotaped interview), and his statements to two of his acquaintances when they confronted him about the crime, amply connect him to the commission of the crime; in fact, his connection to the crime was undisputed.

Instructions advising the jurors to view accomplice testimony with care and caution do not derive from some obscure legal technicality, but are based on the logical assumption that an accomplice has greater motivation to lie than does an ordinary witness.  (See People v. Gordon (1973) 10 Cal.3d 460, 469-471.)  In assessing Bettencourt's credibility, it is not reasonably possible that the jury would fail to view his extrajudicial statements with care and caution.  Although Bettencourt may not have actually been a principal in the robbery and murder, the evidence was sufficient to implicate him in the crimes and he made the statements implicating [petitioner] under a promise of immunity.  At trial, he retracted those statements and claimed he had been lying during the interview.  Although [petitioner] disagrees with the precise form of the instructions given here, they were sufficient to alert the jury to the factors that may cast doubt on an accomplice's testimony.  Moreover, Bettencourt's statements that implicated [petitioner] added nothing to [petitioner's] own extrajudicial statements to multiple persons concerning his involvement in the crimes.

Under the circumstances, there is no reasonable probability that a more favorable result to [petitioner] would have accrued from greater clarity in the accomplice instructions.  (People v. Gordon, supra, 10 Cal.3d at p. 473.)

(Id. at 24-25.)

A challenge to jury instructions does not generally state a federal constitutional claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021 (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process."  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.

1  1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236

2  (1941).

3          In order to warrant federal habeas relief, a challenged jury instruction "cannot be

4  merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

5  process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317

6  (9th Cir. 1988), cert. denied, 488 U.S. 861 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146

7  (1973)).  To prevail, the record must demonstrate that an erroneous instruction "'so infected the

8  entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62,

9  72 (1991) (quoting Cupp, 414 U.S. at 147).  The analysis for determining whether a trial is "so

10  infected with unfairness" as to rise to the level of a due process violation is similar to the analysis

11  used in determining, under Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), whether an error

12  had "a substantial and injurious effect" on the outcome.  See Thomas v. Hubbard, 273 F.3d 1164,

13  1179 (9th Cir. 2001), overruled on other grounds by Payton v. Woodford, 299 F.3d 815, 828 n.11

14  (9th Cir. 2002).  In making its determination, this court must evaluate the challenged jury

15  instructions "'in the context of the overall charge to the jury as a component of the entire trial

16  process.'" Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

17  1984), cert. denied, 469 U.S. 838 (1984)).  Further, in reviewing an allegedly ambiguous

18  instruction, the court "must inquire 'whether there is a reasonable likelihood that the jury has

19  applied the challenged instruction in a way' that violates the Constitution." Estelle, 502 U.S. at

20  72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  Petitioner's burden is "especially

21  heavy" when the court fails to give an instruction.  Henderson v. Kibbe, 431 U.S. 145, 155

22  (1977).

23          Assuming arguendo that the California rules on accomplice testimony apply to

24  Bettencourt, and assuming that the jury instructions on accomplice testimony were confusing or

25  erroneous under California law, petitioner's trial was not rendered fundamentally unfair because

26  of cumulative errors in the instructions given to his jury.  The court first notes that Bettencourt's

1  trial testimony, which was consistent with his statements to police on the day of the murder, was

2  favorable to petitioner.  Bettencourt disavowed his earlier inculpatory statements and stated he

3  was telling the truth at trial.  In any event, for the reasons explained by the California Court of

4  Appeal, petitioner's jury was fully apprised of the inconsistencies between the testimony given

5  by Bettencourt at trial and his earlier statements to police, his motivation to fabricate, and the fact

6  that he was granted immunity from prosecution when he made the extrajudicial inculpatory

7  statements.  Petitioner's jury was also instructed pursuant to CALJIC No. 2.20 that they were

8  entitled to consider anything that had a tendency to prove or disprove the truthfulness of a

9  witness's testimony, including "the existence of nonexistence of a bias, interest, or other

10  motive," and "a statement made by the witness that is inconsistent with his testimony."  (CT at

11  105-06.)  Petitioner's jury was also instructed that a witness who was willfully false in one

12  material part of his testimony was to be distrusted in other parts and that they could reject the

13  entire testimony of a witness who willfully had testified falsely as to a material point.  (Id. at

14  108.)  In short, petitioner's jury was given adequate information to alert them to view

15  Bettencourt's damaging statements with caution.  To the extent that petitioner's defense rested on

16  pointing out the weaknesses in Bettencourt's extrajudicial statements, the events at trial

17  adequately supported that defense tactic.  In any event, as noted by the California Court of

18  Appeal, Bettencourt's extrajudicial statements were essentially cumulative of petitioner's

19  damaging statements to his friends and to the police.  The testimony of Bettencourt, assuming he

20  was an accomplice, was not the only evidence connecting petitioner to the murder of Hesterlee.

21          The conclusion of the California Court of Appeal that any jury instruction errors

22  regarding the evaluation of accomplice testimony at petitioner's trial did not rise to the level of a

23  federal due process violation is not contrary to or an unreasonable application of United States

24  Supreme Court authority.  Accordingly, petitioner is not entitled to relief on his claims of jury

25  instruction error.

26  /////

1    For the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

2  application for a writ of habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District

4  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

5  days after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8  shall be served and filed within ten days after service of the objections.  The parties are advised

9  that failure to file objections within the specified time may waive the right to appeal the District

10  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

11  DATED: March 6, 2006.

12

13                              _____
                              UNITED STATES MAGISTRATE JUDGE
14

15  008:deragon526.hc

16

17

18

19

20

21

22

23

24

25

26